# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:17-CR-20074-04-JAR** |
| **JORGE PORTILLO-URANGA, ET AL.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Jorge Portillo-Uranga's Amended Motion to Suppress (Doc. 268) (Defendants' "Motion").[1] The Court held a hearing on October 9, 2019 at which time two case agents testified. The parties admitted exhibits into evidence at the start of the hearing.[2] Co-defendant Martin Castaneda-Ontiveros orally moved to join Portillo's Motion, and the Court granted that request.[3] In their Motion, Defendants contend that the Government obtained wiretaps in violation of 18 U.S.C. §§ 2510, 2518; the Fourth Amendment; the Fifth Amendment; and Rules 12 and 41 of the Federal Rules of Criminal Procedure. The Motion is fully briefed,[4] and the Court is prepared to rule. For the reasons stated below, the Motion to Suppress (Doc. 221) is **denied as moot**, and the Amended Motion to Suppress (Doc. 268) is **denied**.

---

[1] Defendant Portillo-Uranga's Amended Motion to Suppress (Doc. 268) is identical to his previously-filed Motion to Suppress (Doc. 221) other than the citations to the record.

[2] In conjunction with this hearing, the parties submitted exhibits. *See* Doc. 263 (Government's hearing exhibits); *see also* Docs. 271, 272 (Defendants' hearing exhibits). For the purposes of this Memorandum and Order, those exhibits will be referred to as "Ex." followed by the exhibit number.

[3] Doc. 273.

[4] The Government's Response (Doc. 265), which was filed in response to Portillo's initial Motion to Suppress (Doc. 221), will be considered responsive to the Amended Motion to Suppress because the Amended Motion to Suppress did not contain any substantive changes to Defendants' arguments.

## I.  Background

As part of an investigation into a drug-trafficking organization, Drug Enforcement Administration ("DEA") agents obtained authorization to intercept wire and/or electronic communications of multiple cellular phones pursuant to orders signed in the District of Kansas. In total, thirty-two phones were subject to wiretaps.  Phase I of the investigation focused on "Target Telephones 1–12," ("TTs" 1–12) and Phase II of the investigation focused on "Target Telephones 13–32" ("TTs" 13–32).  Defendants seek "to suppress evidence obtained pursuant to a wiretap interception of wire communications for Target Telephones 1 through 32[.]"[5]

## II.  Standing

As a threshold matter, the Court addresses the standing of each Defendant to seek suppression.  Defendant Portillo argues that he has standing to move for suppression of evidence obtained from all 32 TTs because he is an "aggrieved person" as defined by 18 U.S.C. §§ 2510(11), 2518(10)(a).  Defendant Castaneda joined Portillo's Motion in full.  The Government argues that Castaneda only has standing as to TTs 22–32.

To establish standing to challenge the validity of a wiretap application, a defendant must demonstrate that he is an "aggrieved person,"[6] which is defined as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."[7]  To meet this definition, a defendant must generally show that "(1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises."[8]

---

[5] Doc. 268 at 1.

[6] 18 U.S.C. § 2518(10)(a).

[7] 18 U.S.C. § 2510(11).

[8] *United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006) (citing *United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990)).

Here, the Government does not dispute that Portillo has standing to challenge the validity of wiretaps for all 32 TTs. The Government concedes that, although the Phase I wiretaps were not directed at Portillo's devices, the wiretaps were directed at him. The Government also agrees that Phase II targeted Portillo's devices. After reviewing the pertinent affidavits and wiretap authorizations, the Court finds that Portillo has standing to seek suppression of evidence obtained from wiretaps on all 32 TTs.

The Government argues that Castaneda only has standing regarding TTs 22–32. Regarding the Phase I wiretaps, the Court finds that Castaneda was not intercepted in any conversation. The Court further finds that Castaneda was not a target subject of the Phase I wiretaps, nor did those wiretaps target any of his devices. Moreover, the affidavits for TTs 13–21 do not list Castaneda as a target subject, nor are any of the targeted devices his. Castaneda was also not intercepted on any of these devices. Castaneda was, however, intercepted on TTs 22–28. Castaneda was listed as a target subject in the affidavits authorizing wiretaps for TTs 26–32. Accordingly, Castaneda only has standing to seek suppression of evidence obtained from wiretaps of TTs 22–32.

## III.    Discussion

Defendants argue that the evidence should be suppressed for the following reasons: (1) the tapes of recorded conversations were not timely sealed, (2) minimization was insufficient, (3) the Government has not provided records to show that interception of the telephone calls took place within the territorial jurisdiction of the Court, (4) the authorization orders were deficient because of a lack of necessity,[9] and (5) Defendants were not timely notified of the wiretaps as required by 18 U.S.C. § 2518(8)(d). The Court will discuss Defendants' arguments in turn.

---

[9] The Court notes that Defendant Castaneda previously filed a Motion to Suppress Wiretap Evidence (Doc. 175), arguing that all evidence obtained from intercepts of TTs 21–29 should be suppressed on grounds that the

## A. Sealing

Defendants argue that the discs containing the intercepted conversations were not sealed in the manner required by 18 U.S.C. § 2518(8)(a) and should therefore be suppressed. Section 2518(8)(a) provides that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions."[10] The Supreme Court has established two ways that this requirement may be satisfied: either the recording must have been properly placed under seal, or the Government must provide a satisfactory explanation for its failure to comply with the sealing requirement.[11] The Government must explain both a total absence of any seal, and the lack of a "timely applied" seal.[12] "A *satisfactory* explanation is one that is 'objectively reasonable.'"[13] This means that the Government must "explain not only why a delay occurred but also why it is excusable."[14]

Defendants contend that the Government failed to immediately seal the wiretap discs following the end of the period of interception. Defendants provide a chart to the Court that measures the number of days between the final intercepted communication on a given TT and

---

Government failed to satisfy the "necessity" requirement of 18 U.S.C. § 2518(1)(c). The Court denied that motion, concluding that the Government did meet the necessity requirement as to each TT because it provided "'a full and complete statement as to whether or not other investigative procedures ha[d] been tried and failed or why they reasonably appear[ed] to be unlikely to succeed if tried or be too dangers.'" Doc. 224 at 16 (quoting 18 U.S.C. § 2518(1)(c)). Notwithstanding this previously decided motion, the Court will again address the necessity requirement as it pertains to TTs 21–29 since an additional defendant—Portillo—has moved for suppression on those grounds.

[10] 18 U.S.C. § 2518(8)(a).

[11] *United States v. Ojeda Rios*, 495 U.S. 257, 263 (1990).

[12] *Id.*

[13] *United States v. Jackson*, 207 F.3d 910, 916 (7th Cir. 2000) (citing *Ojeda Rios*, 495 U.S. at 266–67) (emphasis in original).

[14] *Ojeda Rios*, 495 U.S. at 265.

the date on which the recordings were sealed.[15]  This chart, however, does not use the correct measure for determining the length of delay.  As the plain language of § 2518(8)(a) indicates, the sealing requirement is triggered by the expiration of the order authorizing the wiretap.[16]  Accordingly, there was no delay in sealing the recordings for TTs 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 26, 28, 29, 30, 31, and 32 because these recordings were sealed prior to the expiration of their respective authorization periods.  The Court will address the proffered reasons for the delay in sealing of each remaining TT.

### 1.  Thursday or Friday Authorization Expirations Followed by Tuesday Sealing

Defendants argue that any delay in sealing discs of more than two days violates the "immediacy" requirement of § 2518, thereby warranting suppression of those discs absent a satisfactory explanation from the Government.  Many of the "delays" in sealing occurred because the authorization order expired on a Thursday or Friday, and the tapes were not sealed until the following Tuesday.

As the Government's Response explains, and as both DEA Case Agents Nick Wills and Derrick Maguire testified, discs of wiretap recordings for the Overland Park, Kansas DEA Office (the "Overland Park Office") are all processed through the DEA St. Louis Field Division Office (the "St. Louis Office").  The Government further explains that once the authorization period expires—or sooner, in some instances—case agents will contact the St. Louis Office and instruct them to burn the recordings onto Blu-Ray discs.  The discs are then mailed, via FedEx

---

[15] Doc. 268 at 5–7.

[16] The Court notes that neither the Tenth Circuit nor the Supreme Court have directly addressed this issue. However, in the seminal Supreme Court case addressing the sealing of wiretap recordings, the Court reasoned "that the seal required by § 2518(8)(a) is not just any seal but a seal that has been obtained *immediately* upon *expiration of the underlying surveillance order*."  *Ojeda Rios*, 495 U.S. at 263 (emphasis added).  *But see United States v. Cutolo*, 861 F. Supp. 1142, 1149–50 (E.D.N.Y. 1994) (implying that sealing requirements are triggered upon the conclusion of the surveillance period); *United States v. Gerena*, 695 F. Supp. 649, 696 (D. Conn. 1988).

Overnight, to the Overland Park Office.  Agents Wills and Maguire both testified that if an order expires on a Thursday or Friday, agents wait until the following Monday—or Tuesday, in the event of a holiday weekend—to request the Blu-Ray discs be burned.  In the event of Thursday expirations, the agents explained that if the disc is burned and mailed on Friday, it would arrive to the Overland Park Office on Saturday morning, when agents are not typically stationed at the Overland Park Office.  In the event of a Friday or Saturday authorization expiration, the St. Louis Office will not be staffed to burn the disc and mail it out.

The authorization period for TTs 1FE,[17] 2, 3, and 4 expired on Thursday, July 24, 2014 at 11:59 p.m.  Sealing took place for each of these TTs on Tuesday, July 29, 2014.  The agents requested the discs be burned and mailed the following Monday, which was July 28, 2014.  The discs arrived at the Overland Park Office on Tuesday, July 29, 2014 and were sealed later that same day.

The authorization period for TT 5 ended on Saturday, August 2, 2014.  As with TTs 1FE–4, agents requested the Blu-Ray discs of TT 5 intercepts be burned the following Monday, which was August 4, 2014.  The discs for TT 5 were received at the Overland Park Office on the following day, which was Tuesday, August 5. Those discs were sealed later that same day.

The authorization period for TT 21 expired on Friday, May 5, 2017.  Agents in Overland Park requested the Blu-Ray discs for intercepts from TT 21 be created and mailed on Monday, May 8, 2017.  The discs were then mailed via FedEx overnight, and arrived at the Overland Park Office on Tuesday, May 9.  The discs for TT 21 were sealed later that same day.

---

[17] "TT 1FE" refers to the First Extension for TT 1.  Hereinafter, "FE" will refer to any target telephones with a "first extension" application.

The authorization period for TT 27 expired Friday, July 28, 2017. Agents in Overland Park requested the Blu-Ray discs of intercepts from TT 27 be created and mailed on Monday, July 31, 2017. The discs were created on July 31 and mailed via FedEx overnight. The discs arrived at the Overland Park Office on Tuesday, August 1, 2017 and were sealed later that day.

The authorization orders for intercepts of TTs 1FE, 2, 3, 4, 5, 21, and 27 all expired on either a Thursday or Friday; and the discs of those intercepts were sealed on Tuesday of the following week. In light of the information provided by the Government regarding the process for creating, mailing, receiving, and sealing the discs, the Government has met its burden to satisfactorily explain its reasons for such delays.[18]

## 2. Judicial Scheduling Issues

The Government also responds to some of Defendants' challenges by noting that judicial scheduling issues caused some of the delays. The authorization period for TT 7 expired on Tuesday, March 31, 2015. The following day, agents in the St. Louis Office created the Blu-Ray discs and mailed them to the Overland Park Office. Agents in the Overland Park Office received the tapes on Thursday, April 1, 2015. During the October 9, 2019 Hearing, Agent Wills testified that Judge Crabtree—the authorizing judge for the wiretap on TT 7—had scheduling conflicts related to sealing TT 7 discs. Ultimately, to avoid further delay in sealing, Judge Lungstrum signed the sealing order on April 6, 2015.

The authorization period to TT 7FE expired on Saturday, May 2, 2015. On Monday, May 4, 2015, the St. Louis Office created Blu-Ray discs of the interceptions and mailed those

---

[18] *United States v. Maxwell*, 25 F.3d 1389, 1394 (8th Cir. 1994) ("Intervening weekends, holidays, and the unavailability of the issuing judge are satisfactory explanations for slight delays [7 days] in presenting wiretap recordings for sealing."); *United States v. Bennett*, 825 F. Supp. 1512, 1517 (D. Colo. 1993) (concluding that five-day delay between expiration of authorization period and sealing of tapes abided by § 2518 because of an "intervening holiday weekend").

discs to the Overland Park Office via FedEx Overnight. The discs for TT 7FE arrived at the Overland Park Office on Tuesday, May 5, 2015. As Agent Wills testified, there was a scheduling issue which rendered Judge Crabtree—the authorizing judge—unable to sign a sealing order on May 5. Judge Crabtree ultimately signed the sealing order on Wednesday, May 6, 2015.

The authorization period for TTs 22, 23, 24, and 25 all expired on Wednesday, June 7, 2017. In anticipation of the June 9 receipt of the discs for TTs 22–25, the Government requested a June 9 sealing appointment with Judge Crabtree (who had authorized the wiretaps). However, Judge Crabtree's Courtroom Deputy informed the Government that Judge Crabtree would not be available until June 12, 2017. The discs were ultimately sealed on June 12.

All of the delays for these devices—TTs 7, 7FE, 22, 23, 24 and 25—can be attributed not to conduct of the Government, but scheduling issues with the sealing judges. Scheduling issues with the sealing judge constitute a satisfactory explanation for sealing delays.[19] Accordingly, the Court finds that the Government has provided satisfactory explanations for each delay in sealing the discs for TTs 7, 7FE, 22, 23, 24, and 25.

### 3. Miscellaneous Issues: TTs 2 and 19

Sealing issues regarding two TTs remain: TT 2 and TT 19. Defendants argue that there was a 27-day delay between the "end of the period of interception" and the date the discs for TT 2 were sealed. As previously explained, the end of the period of interception does not trigger the sealing requirement; the end of the authorization period does. But even if Defendants'

---

[19] *United States v. Pedroni*, 958 F.2d 262, 266 (9th Cir. 1992) ("The unavailability of the issuing or supervising judge may constitute a satisfactory explanation for a sealing delay."); *United States v. Kusek*, 844 F.2d 942, 946 (2d Cir. 1988); *United States v. Ardito*, 782 F.2d 358, 363 (2d Cir. 1986); *United States v. Fury*, 554 F.2d 522, 533 (2d Cir. 1977) (holding that a six-day delay in sealing was reasonably explained by the unavailability of issuing judge who was on vacation).

interpretation were correct, Wills testified that no calls were intercepted for that TT. The only recorded call was a "test call" from DEA agents attempting to verify the wiretap was set up correctly. In other words, Defendants will suffer no prejudice if the discs from TT 2 are not suppressed.

Defendants also argue that they have not been provided any information regarding TT 19, and that all interceptions recorded therefrom should be suppressed. However, as the Government Response explains and as Agent Maguire testified, no intercepts were recorded from TT 19. It is unclear that any discs related to TT 19 exist. Unless and until such evidence is identified, the Court declines to suppress the same.

### 4. Alternative Trigger Date: Using the End of Interception Period Rather Than the End of the Authorization Period

Even if the Defendants were correct that the sealing requirement is triggered at the end of the surveillance period rather than the authorization period, the Government has met its burden to provide a satisfactory explanation for each delay. Here, the Government has explained that it relied on the plain language of § 2518 to determine that the sealing requirement was triggered once the authorization period expired. As Agent Wills testified, sometimes a phone line will be inactive and subsequently resume activity within the authorization period. Agent Maguire also testified that, for some of the roving authorizations, Judge Crabtree instructed him to wait and seal all of the discs at the end of the authorization period. In other words, the Government has demonstrated that it has objectively reasonable explanations for each delay, even if this Court were to ultimately decide that the sealing trigger date was the end of the surveillance period.

Moreover, neither the Tenth Circuit nor the Supreme Court have given any indication that the Government's reasoning would be unreasonable. Even if the calculation of the trigger date for sealing purposes were to be a mistake of law, such mistake will qualify as a satisfactory

excuse so long as that mistake of law was "objectively reasonable" at the time.[20]  Relying on a judge's instructions to seal multiple tapes at the expiration of the authorization period constitutes objectively reasonable reliance, even assuming arguendo that such instruction were a "mistake of law."  The same reasoning excuses the agents' reliance on the plain language of § 2518 to determine that the trigger date of the sealing requirement was the expiration of wiretap authority rather than the expiration of the surveillance period.  Accordingly, the Court finds that the Government has met its burden to provide a satisfactory explanation for its delays in sealing the wiretap recordings for TTs 1FE, 2, 3, 4, 5, 7, 7FE, 21, 22, 23, 24, 25, and 27 regardless of whether the trigger date for sealing recordings is the end of the authorization period or the end of the surveillance period.

## B. Minimization

Defendants also argue that all evidence from the wiretaps should be suppressed because the Government did not meet minimization requirements.  Specifically, the Defendants argue that: (1) regarding TTs 1–12, the Government has not demonstrated individuals listening to intercepted conversations were properly instructed on their legal limitations; and (2) regarding all TTs, the Government has not demonstrated that it properly minimized foreign language intercepts.

Federal law permits the Government to apply for and obtain wiretap authorization upon a determination that probable cause exists to believe that an individual is committing, has committed, or is about to commit particular crimes.[21]  Judicial orders permitting a wiretap must specify that the wiretap will "be conducted in such a way as to minimize the interception of

---

[20] *United States v. Ojeda Rios*, 495 U.S. 257, 266 (1990).

[21] 18 U.S.C. § 2518(3)(a).

communications not otherwise subject to interception."[22]  If a wiretap was not conducted in conformity with this "minimization" requirement, a defendant may move to suppress evidence obtained therefrom.[23]  As the Supreme Court has noted, "this provision does not create an 'inflexible rule of law,' but rather demands an evaluation of the 'facts and circumstances of each case.'"[24]

In *United States v. Willis*,[25] the Tenth Circuit described the procedure for determining whether the Government's minimization efforts were reasonable.  First, "[t]he government must make an initial prima facie showing of reasonable minimization."[26]  "'Once the government has made a prima facie showing of reasonable minimization, the burden then shifts to the defendant to show more effective minimization could have taken place.'"[27]  To determine whether the Government has established a prima facie case of reasonable minimization, courts consider the following factors: (1) whether a large number of the calls are very short, one-time only, or in guarded or coded language, (2) the breadth of the underlying investigation that gave rise to the need for the wiretap, (3) whether the phone is public or private, (4) whether the non-minimized calls occurred early in the surveillance period, and (5) the extent to which the authorizing judge supervised the ongoing wiretap.[28]

---

[22] 18 U.S.C. § 2518(5).

[23] 18 U.S.C. § 2518(10)(a).

[24] *United States v. Killingsworth*, 117 F.3d 1159, 1165 (10th Cir. 1997) (quoting *Scott v. United States*, 436 U.S. 128, 139–40 (1978)).

[25] 890 F.2d 1099, 1102 (10th Cir. 1989).

[26] *United States v. Yarbrough*, 527 F.3d 1092, 1098 (10th Cir. 2008) (citing *United States v. Willis*, 890 F.2d 1099, 1102 (10th Cir. 1989)).

[27] *Id.*

[28] *Scott*, 436 U.S. at 140–41; *see also Yarbrough*, 527 F.3d at 1098.

Here, Defendants do not allege that the Government has failed to meet its prima facie burden.  Instead, Defendants base their claims on the Government's failure to produce signed copies of a supervising attorney's memorandum to the DEA agents regarding minimization.[29] Neither § 2518(5) nor judicial precedent set out a specific procedure that must take place to achieve minimization; there is no statutory or judicial requirement that agents sign an acknowledgement that they have been instructed on minimization.

Moreover, the Court is satisfied that the Government has established a prima facie case demonstrating compliance with the minimization requirement.  The Government has: (1) produced memoranda that the supervising attorney provided to each person who listened to intercepted calls; (2) elicited testimony that all those memoranda were signed by the recipients; and (3) provided 15-day progress reports, each of which describe minimization procedures that agents utilized.  The Government argues—and the Court agrees—that pre-interception briefing is a cautionary method employed by the Government and not a statutory or judicially-imposed requirement.  The lack of signed memoranda is therefore not a source of concern for the Court, particularly in light of the progress reports for each TT that describe minimization procedures for the intercepted conversations.

Defendants also make arguments related to translation and interpretation of Spanish-language interceptions.  Defendants assert that "without adequate documentation of the foreign language minimization process, it is impossible to assess whether the government did, in fact, have a Spanish speaker present and, when there was no translator, whether it minimized 'as soon

---

[29] During the October 9, 2019 Hearing, the Government informed the Court that the signed copies of four of the twelve memoranda had been located and provided to opposing counsel.  In addition, Agent Wills testified that all of the memoranda had been signed, but were not able to be located.  The Government assured both the Court and opposing counsel that if signed copies of these memoranda were located, they would be disclosed.

as practical' after interception."[30]  While unclear, the argument seems to be based on a lack of

documentation.  But again, the minimization requirement is assessed under a standard of

reasonableness.  The Government has established that the same minimization procedures were

employed for English and Spanish language interceptions.  It has met its prima facie burden to

demonstrate reasonable minimization took place for all calls—including those in Spanish.  The

burden then shifts to Defendants to demonstrate more effective minimization could have taken

place.  Defendants have failed to make such an allegation.

In sum, these interceptions do not violate the minimization requirement of 18 U.S.C. §

2518(5).  The Government has established its prima facie case, and Defendants have not alleged

that "more effective minimization could have taken place."[31]

### C.  Territorial Jurisdiction

Defendants also argue that the Government has failed to "provide records to show that

interception of the telephone calls took place within the territorial jurisdiction of the Court."[32]  At

the October 9, 2019 Hearing, Agents Wills and Maguire testified that monitoring of all 32 TTs

took place within the District of Kansas.  Both agents testified that the DEA listening post was

located in Overland Park, Kansas, and that the location did not change during the course of the

investigation.

Section 2518(3) proves that, upon application and finding a statutory cause for the

wiretap, a court:

> may enter an ex parte order, as requested or modified, authorizing
> or approving interception of wire, oral, or electronic
> communications within the territorial jurisdiction of the court in
> which the judge is sitting (and outside that jurisdiction but within

---

[30] Doc. 268 at 10–11.

[31] *Willis*, 890 F.2d at 1102.

[32] Doc. 268 at 11.

the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction).[33]

In the Tenth Circuit, a communication is deemed "intercepted" for purposes of § 2518(3) either "where the tapped telephone is located" or "where the contents of the redirected communication are to first be heard."[34] Here, as Agents Wills and Maguire testified, the "redirected communications" were all first heard at the DEA's listening post in Overland Park, Kansas; and, the location of that listening post did not change during the court of this investigation. Thus, all interceptions took place within the territorial jurisdiction of this Court.

### D. Necessity

Defendants next argue that the affidavits supporting each wiretap did not meet the necessity requirement imposed by 18 U.S.C. § 2518(1)(c). Defendants contend that necessity was lacking for the following reasons: (1) normal investigative procedures were successful, (2) the stated purposes of the investigation had already been achieved, (3) less intrusive means to obtain information were successfully utilized, and (4) the Government did not demonstrate that the use of traditional investigative techniques would have been too dangerous. The Government responds that the affidavits established the necessity requirement.

As a threshold issue, the Court notes that Castaneda has previously filed a Motion to Suppress Wiretap Evidence.[35] That motion argued that the Government failed to satisfy the necessity requirement as to TTs 21–29. This Court denied that motion, finding that Castaneda did not have standing to seek suppression of intercepts from TT 21, and that the Government had

---

[33] 18 U.S.C. § 2518(3).

[34] *United States v. Tavarez*, 40 F.3d 1136, 1138 (10th Cir. 1994).

[35] Doc. 175.

met the necessity requirement for TTs 22–29.[36]   However, Portillo did not join in that motion, and the instant Motion applies to all 32 TTs.  Notwithstanding its prior Memorandum and Order, the Court will address all arguments—including those about TTs 21–29 that echo Castaneda's prior Motion to Suppress—made in the instant Motion.

### 1.  Legal Standard

Under 18 U.S.C. § 2518(1)(c), each wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[37] Additionally, before authorizing a wiretap investigation, a court must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."[38]  "Normal" investigative procedures include standard physical and video surveillance, questioning of witnesses and participants in the crime (including through the use of grand juries), executing search warrants, and the use of undercover agents or confidential informants.[39]  "This rule is known as the 'necessity' requirement."[40]  The purpose of this requirement is to "ensure that the relatively intrusive device 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'"[41]

In determining whether a wiretap application is supported by a showing of necessity, a court must consider "all the facts and circumstances" and read the necessity requirement "in a

---

[36] Doc. 224.

[37] 18 U.S.C. § 2518(1)(c).

[38] 18 U.S.C. § 2518(3)(c).

[39] *United States v. Zapata*, 546 F.3d 1179, 1185 (10th Cir. 2008) (citing *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997)).

[40] *Id.* (citing *United States v. Mondragon*, 52 F.3d 291, 293 (10th Cir. 1995)).

[41] *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)).

common sense fashion."[42]  To meet the necessity requirement, the Government need not

"'exhaust all other conceivable investigative procedures before resorting to wiretapping.'"[43]

Rather, if any traditional investigative techniques are not used, the Government must explain

with particularity why it did not employ these techniques.[44]  Once a wiretap application is

authorized, the defendant bears the burden of proving that the authorization was invalid.[45]  "If a

defendant succeeds in showing that the necessity requirement was not met, evidence seized

pursuant to the wiretap must be suppressed."[46]

### 2.   Goals of the Investigation/Stated Purpose of the Investigation

Defendants argue that the Government cannot establish necessity because "[m]ost, if not

all, of the purposes or objectives stated in the Affidavit [for TT 1] were already known to the

government" when the Government applied for wiretaps.[47]  Defendants also assert that before the

Government had applied for any wiretap orders, it already knew the organization's key personnel

and had met other investigative objectives laid out above.  The Government responds that "the

target subjects were not all federally prosecutable before the Court granted Title III authority,"[48]

meaning the Government had not achieved the legitimate goals of the investigation at the time it

submitted wiretap applications.  It adds that "[t]he standard for necessity is not whether the

defendant and others could be prosecuted for *any* federal crime without the use of Title III

---

[42] *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002) (citing *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989)).

[43] *Zapata*, 546 F.3d at 1186 (quoting *Edwards*, 69 F.3d at 419).

[44] *Ramirez-Encarnacion*, 291 F.3d at 1222 (citing *United States v. Mitchell*, 274 F.3d 1307, 1310 (10th Cir. 2001)).

[45] *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003) (quoting *Ramirez-Encarnacion*, 291 F.3d at 1222).

[46] *Id.* (quoting in part *Ramirez-Encarnacion*, 291 F.3d at 1222).

[47] Doc. 268 at 16.

[48] Doc. 265 at 52.

intercepts" but "whether the legitimate goals of the investigation"—including discovering the full breadth and operating procedures of the trafficking organization—"could be achieved through traditional investigative techniques."[49]

Each Phase I affidavit describes the goals of the investigation as follows:

a. discovering the full scope and identification of key personnel involved in illegal drug trafficking on behalf of [the Target Subjects], and others yet unknown;

b. discovering the identities and roles of all suppliers of cocaine, "ice" methamphetamine, marijuana, and/or other drugs or controlled substances to the conspirators;

c. discovering the identity of the main customers of [the Target Subjects], and others yet unknown;

d. discovering the stash locations where cocaine, "ice" methamphetamine, marijuana, and/or other drugs are stored or manufactured prior to distribution;

e. discovering the management and disposition of proceeds generated by the organization's drug trafficking; and,

f. obtaining admissible evidence that proves beyond a reasonable doubt that [the Target Subjects], and any later identified targets, committed the alleged violations of law set forth herein.[50]

The investigatory goals listed in each Phase II affidavit are substantially similar to those listed for Phase I.[51]

---

[49] *Id.*

[50] Ex. 1a at 31–32 (TT 1); Ex. 1c at 30–31 (TT 1FE and TTs 2–4); Ex. 2a at 15–16 (TT 5); Ex. 3a at 19–20 (TT 6); Ex. 4a at 27–29 (TT 7); Ex. 4b at 45–47 (TTs 7FE and 8); Ex. 5a at 25–26 (TT 9); Ex. 6a at 29–30 (TTs 10–11); Ex. 7a at 31–33 (TT 12).

[51] Those are:
a. discovering the full scope and identification of key personnel involved in illegal drug trafficking on behalf of [the Target Subjects], and others yet unknown;

b. discovering the identities and roles of all suppliers of cocaine, marijuana, and/or other drugs or controlled substances to the conspirators;

To begin, the Court agrees with the Government that its stated investigative objectives provided in the Phase I and II affidavits were neither overly broad nor illusory.[52]  The Court also finds Defendants' assertion that the "identity of key personnel" and other investigatory "purposes or objectives stated in the Affidavit[s] were already known to the government" prior to applying for wiretaps to be belied by the record.  As the Government concedes, it did know *some* information before applying for wiretaps; however, having such information did not obviate law enforcement's need for wiretaps to fully achieve the investigation's legitimate goals.  For instance, as the Government has explained, the wiretaps were needed to determine the full scope of the conspiracy, to identify the key personnel—both known and unknown—of the conspiracy, and to discover the identity and roles of all suppliers.

The Court finds that the objectives here were legitimate.  Although the Government gained information about components of the conspiracy throughout its investigation, the

---

<ol type="c" start="3">
<li>discovering the identity of the main customers of [the Target Subjects], and others yet unknown;</li>
<li>discovering the stash locations where cocaine, marijuana, and/or other drugs are stored or manufactured prior to distribution;</li>
<li>discovering the management and disposition of proceeds generated by the organization's drug trafficking members; and,</li>
<li>obtaining admissible evidence that proves beyond a reasonable doubt [the Target Subjects], and any later identified targets, committed the alleged violations of law set forth herein.</li>
</ol>

Ex. 8a at 33–34 (TT 13); Ex. 9a at 50–51 (TTs 14–16); Ex. 10a at 41–42 (TT 17); Ex. 11a at 42–43 (TT 18); Ex. 12a at 56–57 (TT 20); Ex. 13a at 54–56 (TT 21); Ex. 14a at 106–08 (TTs 22–25 and roving authority);  Ex. 15a at 56–58 (TTs 26–29); Ex. 16a at 71–72 (TTs 30–32).

[52] The Tenth Circuit has deemed similar investigative objectives legitimate.  *See United States v. Foy*, 641 F.3d 455, 464–65 (10th Cir. 2011) (compiling cases in which the Tenth Circuit has held "that the law enforcement goal of uncovering the size and scope of the conspiracy may justify the authorization of wiretaps"); *see also United States v. Garcia*, 232 F.3d 1309 (10th Cir. 2000) (holding that "wiretaps were necessary to reveal the full scope of the conspiracy and to identify [the presumptive leader's] suppliers.").

Government did not fully achieve the objectives of the investigation prior to the wiretap applications.

### 3. Normal Investigative Procedures, Lesser Intrusive Means, and Dangerousness

Defendants argue that the wiretaps did not meet the necessity requirement because, they assert, the Government failed to show that normal investigative techniques were tried and failed, were unlikely to succeed, or were likely too dangerous to attempt. Notwithstanding this assertion, each of the Government's wiretap affidavits describes either the use of normal investigative procedures and their respective failures, or a detailed explanation of why a particular traditional procedure would be unlikely to succeed. Some affidavits also explain the dangerousness of employing traditional investigative techniques. Each affidavit is detailed and, although the explanations as to normal investigative procedures are similar in many of the affidavits, additional factual statements were added throughout the investigation.[53] Courts are to view the relative "success of normal investigative procedures" in totality.[54] However, for the sake of completeness, the Court will discuss each "traditional investigative procedure" below.

### i. Confidential Human Sources, Controlled Purchases, and Undercover Agents

The Phase I affidavits reference information from multiple "confidential sources" (hereinafter, "CSes").[55] The affidavits state that each CS provided some information, but that the information was limited in scope. For instance, in the affidavit for TT 12, the agent described

---

[53] See United States v. Wright, 156 F. Supp. 2d 1218, 1225 (D. Kan. 2001) (explaining that such similarities are to be expected in cases involving multiple wiretap applications for phones belonging to limited parties).

[54] United States v. Ramirez-Encarnacion, 291 F.3d 1219, 1222 (10th Cir. 2002) (citing United States v. Nunez, 877 F.2d 1470, 1472 (10th Cir. 1989)).

[55] See Ex. 1a at 10–15, 30–35 (TT 1); Ex. 1c at 14, 29–35 (TT 1FE and TTs 2–4); Ex. 2a at 10, 15–20 (TT 5); Ex. 3a at 12, 19–28 (TT 6); Ex. 4a at 16, 27–40 (TT 7); Ex. 4b at 15, 45–56 (TTs 7FE and 8); Ex. 5a at 14, 24–36 (TT 9); Ex. 6a at 16, 28–41 (TTs 10–11); Ex. 7a at 17–18, 31–45 (TT 12).

how CS #1 had "been unable to breech the inner circle" of the organization, "because the group has proven to be extremely tight-knit and cohesive."[56]  Another affidavit describes how a CS conducted a purchase of one-half pound of "ice" methamphetamine from a Target Subject to identify his supplier.[57]  That transaction did not succeed in revealing the Target Subject's source(s).[58]  The affiants wrote that, based on attempts to use CSes in the investigation without success, they did not believe that CSes would be able to identify the Target Subjects' source(s) of supply or reveal the full scope of the Target Subjects' distribution efforts.[59]

The Phase II affidavits similarly explain the use of CSes, and also describe using undercover agents and cooperating defendants.[60]  The affiants conclude that "[a]lthough each confidential informant/source has been able to provide information in varying degrees [regarding personnel] . . . the information, by itself, is insufficient to achieve the goals and objectives of this investigation[.]"[61]  Each Phase II affidavit then describes efforts each CS (including the undercover agent and cooperating defendants) has undergone, and the limited nature of that individual's success in reaching the investigative objectives.

Defendants contend that the Government successfully used confidential sources.[62]  They assert, without specificity, that "[u]tilization of . . . informants was effective and additional use of

---

[56] Ex. 7a at 34.

[57] Ex. 2a at 19.

[58] *Id.*

[59] Ex. 1a at 34–35 (TT 1); Ex. 1c at 34 (TT 1FE and TTs 2–4); Ex. 2a at 19 (TT 5); Ex. 3a at 27–28 (TT 6); Ex. 4a at 39 (TT 7); Ex. 4b at 55–56 (TTs 7FE and 8); Ex. 5a at 35 (TT 9); Ex. 6a at 40 (TTs 10–11); Ex. 7a at 43–44 (TT 12).

[60] Ex. 8a at 12, 34–42 (TT 13); Ex. 9a at 14, 52–61 (TTs 14–16); Ex. 10a at 15, 42–52 (TT 17); Ex. 11a at 15–16, 44–52 (TT 18); Ex. 12a at 18, 58–67 (TT 20); Ex. 13a at 18–19, 56–58 (TT 21); Ex. 14a at 23–24, 108–11 (TTs 22–25 and roving authority);  Ex. 15a at 28, 58–61 (TTs 26–29); Ex. 16a at 28–29, 73–75 (TTs 30–32).

[61] *See, e.g.*, Ex. 11a at 44.

[62] Doc. 268 at 17.

the same would have not only been fruitful to the government[,] but a less intrusive means of gathering information."[63]  In its Response, the Government explains that it has met its burden under 18 U.S.C. § 2518(1)(c) to include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[64]  Upon review of the affidavits, the Court finds that the Government has met its burden of demonstrating that the use of confidential human sources was unlikely to succeed in fully accomplishing the stated objectives of the investigation.

## ii.  Physical Surveillance

Each affidavit also describes the limited utility of physical surveillance during the investigation.[65]  According to the affidavits, physical surveillance could confirm meetings and raise suspicions that criminal activity occurred, but could not reveal the purpose of those meetings or confirm illegal activity.[66]  For example, the affidavits explained that physically surveilling Target Subjects helped agents identify vehicles and potential stash locations used by the organization.[67]  However, as certain affidavits explain, mere identification of vehicles—

---

[63] *Id.* at 18.

[64] Doc. 265 at 46 (quoting 18 U.S.C. § 2518(1)(c)).

[65] Ex. 1a at 36–40 (TT 1); Ex. 1c at 36–42 (TT 1FE and TTs 2–4); Ex. 2a at 22–27 (TT 5); Ex. 3a at 29–30 (TT 6); Ex. 4a at 42–46 (TT 7); Ex. 4b at 58–60 (TTs 7FE and 8); Ex. 5a at 38–40 (TT 9); Ex. 6a at 43–47 (TTs 10–11); Ex. 7a at 47–50 (TT 12); Ex. 8a at 45–47 (TT 13); Ex. 9a at 63–68 (TTs 14–16); Ex. 10a at 54–60 (TT 17); Ex. 11a at 55–61 (TT 18); Ex. 12a at 69–76 (TT 20); Ex. 13a at 60–66 (TT 21); Ex. 14a at 114–20 (TTs 22–25 and roving authority); Ex. 15a at 64–76 (TTs 26–29); Ex. 16a at 79–91 (TTs 30–32).

[66] Ex. 1a at 36 (TT 1); Ex. 1c at 36 (TT 1FE and TTs 2–4); Ex. 2a at 23, 25 (TT 5); Ex. 3a at 29–30 (TT 6); Ex. 4a at 42 (TT 7); Ex. 4b at 58 (TTs 7FE and 8); Ex. 5a at 38 (TT 9); Ex. 6a at 43 (TTs 10–11); Ex. 7a at 47–48 (TT 12); Ex. 8a at 45–46 (TT 13); Ex. 9a at 63, 65–67 (TTs 14–16); Ex. 10a at 54 (TT 17); Ex. 11a at 55 (TT 18); Ex. 12a at 69–70 (TT 20); Ex. 13a at 60, 62–64 (TT 21); Ex. 14a at 114 (TTs 22–25 and roving authority); Ex. 15a at 64 (TTs 26–29); Ex. 16a at 79 (TTs 30–32).

[67] Ex. 1a at 37–38 (TT 1); Ex. 1c at 37–40 (TT 1FE and TTs 2–4); Ex. 2a at 23 (TT 5); Ex. 3a at 30 (TT 6); Ex. 4a at 43, 45 (TT 7); Ex. 4b at 58–60 (TTs 7FE and 8); Ex. 5a at 38–40 (TT 9); Ex. 6a at 44–45 (TTs 10–11); Ex. 7a at 47–50 (TT 12); Ex. 8a at 46 (TT 13); Ex. 9a at 63, 65–68 (TTs 14–16); Ex. 10a at 54–56 (TT 17); Ex. 11a at 56–58 (TT 18); Ex. 12a at 70–72 (TT 20); Ex. 13a at 63–65 (TT 21); Ex. 14a at 114–15 (TTs 22–25 and roving authority); Ex. 15a at 65–71 (TTs 26–29); Ex. 16a at 79–80, 83–84 (TTs 30–32).

without supplemental information from wiretapping—does not reveal whether the vehicles contain narcotics or U.S. currency.[68]  In another instance, the affiant explained that agents conducted physical surveillance of an auto repair shop, which was suspected to host some of the organization's illegal activity.[69]  Agents conducted physical surveillance at that location, but were unable to discern which vehicles and individuals went to the shop for legitimate reasons as opposed to illicit reasons.[70]  Even in combination with other traditional methods, physical surveillance neither confirmed criminal activity, nor identified key personnel in the organization, including suppliers.

Defendants argue, however, that "[p]hysical surveillance was integral to the Government's investigation on this matter" when used in conjunction with other traditional investigative procedures.[71]  Based on its review of the affidavits, the Court finds the Government adequately explained the limitations of physical surveillance, including the inability to reveal the purpose of meetings, identify suspected conspirators, and uncover the organizations source(s) of supply.  Further, considering the detailed limitations of physical surveillance, the Court is convinced that the continued use of physical surveillance could have compromised the agents.

### iii. GPS Tracking Devices, Pole Cameras, and Cell-Site Location Information

Each affidavit explains that GPS tracking devices, pole cameras, and cell-site location information ("CSLI") aided the Government in its investigation.[72]  Based in part on GPS and

---

[68] *See, e.g.*, Ex. 2a at 25–26; Ex. 4a at 43; Ex. 13a at 61.

[69] Ex. 4a at 43.

[70] *Id.* at 43–44.

[71] Doc. 268 at 18.

[72] Ex. 1a at 38, 40 (TT 1); Ex. 1c at 38–40 (TT 1FE and TTs 2–4); Ex. 2a at 23–25 (TT 5); Ex. 3a at 32–33, 42–46 (TT 6); Ex. 4a at 45–46, 62, 64–66 (TT 7); Ex. 4b at 73–76 (TTs 7FE and 8); Ex. 5a at 54–59 (TT 9); Ex. 6a at 61–67 (TTs 10–11); Ex. 7a at 52–53, 66–70 (TT 12); Ex. 8a at 57–61 (TT 13); Ex. 9a at 69, 78–82 (TTs 14–16); Ex. 10a at 62, 72–76 (TT 17); Ex. 11a at 73–80 (TT 18); Ex. 12a at 89–94 (TT 20); Ex. 13a at 79–85 (TT 21); Ex.

CSLI information, agents positioned pole cameras to monitor activity at significant locations.[73] The cameras, however, did not reveal whether the Target Subjects carried narcotics, weapons, or drug proceeds in and out of buildings; nor did the use of GPS information or CSLI prior to utilizing wiretaps verify the identity stash locations or the organization's source(s) of supply.[74] Two of the affiants testified at the October 9, 2019 Hearing that the camera's complete lack of sound limited the investigation because agents were left to speculate about the activity captured thereon. The affidavits also explain the shortcomings of CSLI, including its lack of precision and the infrequent (in at least one instance, only once per 15-minute period) capture of the data.[75] Additionally, Agent Wills testified that although CSLI could provide a general sense of where someone had gone, it could not reveal the purpose of a trip.

Defendants assert that GPS information, pole cameras, and CSLI were "beneficial in corroborating the movements of target subjects and ascertaining the properties visited by the target subjects."[76] They also argue that the affidavits are insufficient because they describe "how various forms of surveillance are better used to corroborate the intercepted wire communications,

---

14a at 123–24, 135–40 (TTs 22–25 and roving authority); Ex. 15a at 91–99 (TTs 26–29); Ex. 16a at 107–13 (TTs 30–32).

[73] Ex. 1a at 36, 38–39 (TT 1); Ex. 1c at 37, 42 (TT 1FE and TTs 2–4); Ex. 2a at 22–23, 27 (TT 5); Ex. 3a at 42–46 (TT 6); Ex. 4a at 61–64, 66–67 (TT 7); Ex. 4b at 73–75 (TTs 7FE and 8); Ex. 5a at 54–56 (TT 9); Ex. 6a at 61–67 (TTs 10–11); Ex. 7a at 66–67 (TT 12); Ex. 8a at 57–58 (TT 13); Ex. 9a at 78–80 (TTs 14–16); Ex. 10a at 72–73 (TT 17); Ex. 11a at 73–75 (TT 18); Ex. 12a at 89–91 (TT 20); Ex. 13a at 79–80 (TT 21); Ex. 14a at 135–36 (TTs 22–25 and roving authority); Ex. 15a at 91–93 (TTs 26–29); Ex. 16a at 107–09 (TTs 30–32).

[74] Ex. 1a at 38–39 (TT 1); Ex. 1c at 37–42 (TT 1FE and TTs 2–4); Ex. 2a at 22–23 (TT 5); Ex. 3a at 43–44 (TT 6); Ex. 4a at 64–67 (TT 7); Ex. 4b at 77 (TTs 7FE and 8); Ex. 5a at 57–59 (TT 9); Ex. 6a at 64–65 (TTs 10–11); Ex. 7a at 67–71 (TT 12); Ex. 8a at 58–61 (TT 13); Ex. 9a at 82 (TTs 14–16); Ex. 10a at 73–76 (TT 17); Ex. 11a at 73–75 (TT 18); Ex. 12a at 90–94 (TT 20); Ex. 13a at 80–86 (TT 21); Ex. 14a at 135–36 (TTs 22–25 and roving authority); Ex. 15a at 91–93, 96–99 (TTs 26–29); Ex. 16a at 107–15 (TTs 30–32).

[75] Ex. 1a at 38 (TT 1); Ex. 1c at 38–39 (TT 1FE and TTs 2–4); Ex. 2a at 23–25 (TT 5); Ex. 3a at 44–45 (TT 6); Ex. 4a at 64–66 (TT 7); Ex. 4b at 75–76 (TTs 7FE and 8); Ex. 5a at 56–57 (TT 9); Ex. 6a at 64–65 (TTs 10–11); Ex. 7a at 69–70 (TT 12); Ex. 8a at 58–59 (TT 13); Ex. 9a at 80–81 (TTs 14–16); Ex. 10a at 74–75 (TT 17); Ex. 11a at 75–76 (TT 18); Ex. 12a at 91–92 (TT 20); Ex. 13a at 80–82 (TT 21); Ex. 14a at 136–39 (TTs 22–25 and roving authority); Ex. 15a at 93–94 (TTs 26–29); Ex. 16a at 110–11 (TTs 30–32).

[76] Doc. 268 at 18.

but the protections set forth in 18 U.S.C. § 2518 (1)(c) were established to ensure that law enforcement does not look to intercept wire communications as its primary investigative tool, but rather the tool of last resort."[77]  The Court finds that, although GPS tracking, pole cameras, and CSLI provided some benefit, the Government has adequately explained how these traditional methods failed to achieve the investigative objectives.

### iv.    Traditional Investigative Procedures Not Addressed in Defendants' Motion

Defendants' Motion does not address many of the traditional investigative techniques that agents employed and detailed in their respective affidavits.  As part of its evaluation of normal investigative procedures as a whole, the Court will also address these methods in turn.

*Search Warrants*

The affidavits explain the agents' use of search warrants, in part to obtain CSLI from phones used by Target Subjects.[78]  As previously noted, CSLI did not provide agents with significant information they needed during the investigation.  The affidavits also address the agents' beliefs that executing search warrants on certain locations associated with the Target Subjects would prematurely terminate the investigation.[79]  In particular, the affidavits emphasized that executing a search warrant would reveal the fact of an investigation to the

---

[77] *Id.* at 18–19 (errors in original).

[78] Ex. 1a at 41–45 (TT 1); Ex. 1c at 43–44 (TT 1FE and TTs 2–4); Ex. 2a at 29–33 (TT 5); Ex. 3a at 32 (TT 6); Ex. 4a at 48 (TT 7); Ex. 4b at 61–62, 75–76 (TTs 7FE and 8); Ex. 5a at 41–42 (TT 9); Ex. 6a at 48–49, 64–65 (TTs 10–11); Ex. 7a at 52–53 (TT 12); Ex. 8a at 49 (TT 13); Ex. 9a at 69 (TTs 14–16); Ex. 10a at 62 (TT 17); Ex. 11a at 75–78 (TT 18); Ex. 12a at 78, 92–94 (TT 20); Ex. 13a at 69–70 (TT 21); Ex. 14a at 123–24, 135 (TTs 22–25 and roving authority); Ex. 15a at 79, 82–83 (TTs 26–29); Ex. 16a at 94–95(TTs 30–32).

[79] Ex. 1a at 42–44 (TT 1); Ex. 1c at 44–46 (TT 1FE and TTs 2–4); Ex. 2a at 30–32 (TT 5); Ex. 3a at 33–35 (TT 6); Ex. 4a at 50–53 (TT 7); Ex. 4b at 63–65 (TTs 7FE and 8); Ex. 5a at 43–46 (TT 9); Ex. 6a at 50–53 (TTs 10–11); Ex. 7a at 53–56 (TT 12); Ex. 8a at 51–52 (TT 13); Ex. 9a at 69–72 (TTs 14–16); Ex. 10a at 63–64 (TT 17); Ex. 11a at 63–66 (TT 18); Ex. 12a at 78–82 (TT 20); Ex. 13a at 69–74 (TT 21); Ex. 14a at 124–26 (TTs 22–25 and roving authority); Ex. 15a at 79–83 (TTs 26–29); Ex. 16a at 95–100 (TTs 30–32).

Target Subjects, causing them to flee or drastically change their operations.[80]  Agents did execute search warrants on some of the organization's significant locations; however, the searches did not reveal all information sought by investigators.[81]  Further, the affidavits explained that agents did not have probable cause to search some houses, or did not believe a search would lead to the discovery of stash locations, sources of supply for the organization, or other co-conspirators.[82]

The Court acknowledges that the Government may well have gained additional information about the conspiracy through executing search warrants; however, the Court also acknowledges the Government's concern that doing so might have undermined the investigation, leaving the Government with limited evidence regarding the broader conspiracy.  The Court therefore finds the Government has adequately explained how this traditional method would not have been likely to successfully meet the stated investigative objectives.

*Trash Searches*

The affidavits also mention trash searches, explaining that agents had not conducted trash searches because doing so would have been unlikely to be successful, or, in some instances, risked exposing the investigation.[83]  For instance, one affiant explained that a trash search might

---

[80] Ex. 1a at 43 (TT 1); Ex. 1c at 46 (TT 1FE and TTs 2–4); Ex. 2a at 31 (TT 5); Ex. 3a at 33–35  (TT 6); Ex. 4a at 50–52 (TT 7); Ex. 4b at 65–66 (TTs 7FE and 8); Ex. 5a at 43, 45–46 (TT 9); Ex. 6a at 51–53 (TTs 10–11); Ex. 7a at 53–56 (TT 12); Ex. 8a at 51–52 (TT 13); Ex. 9a at 69–72 (TTs 14–16); Ex. 10a at 63–64, 66 (TT 17); Ex. 11a at 63–66 (TT 18); Ex. 12a at 78–82 (TT 20); Ex. 13a at 69–74 (TT 21); Ex. 14a at 124–26 (TTs 22–25 and roving authority); Ex. 15a at 79–83 (TTs 26–29); Ex. 16a at 95–99 (TTs 30–32).

[81] Ex. 3a at 32–33 (TT 6); Ex. 4a at 49–55 (TT 7); Ex. 4b at 62–63, 66–68 (TTs 7FE and 8); Ex. 5a at 42–43, 47–50 (TT 9); Ex. 6a at 49–50, 54–56 (TTs 10–11); Ex. 7a at 53–54, 58–59 (TT 12); Ex. 8a at 50–53 (TT 13); Ex. 9a at 72–74 (TTs 14–16); Ex. 11a at 67–68 (TT 18); Ex. 12a at 82–83 (TT 20); Ex. 13a at 72–74 (TT 21); Ex. 14a at 128–29 (TTs 22–25 and roving authority); Ex. 15a at 82–85 (TTs 26–29); Ex. 16a at 99–100 (TTs 30–32).

[82] Ex. 1a at 43–45 (TT 1); Ex. 1c at 47 (TT 1FE and TTs 2–4); Ex. 2a at 33 (TT 5); Ex. 3a at 40–42 (TT 6); Ex. 4a at 56 (TT 7); Ex. 4b at 68–69 (TTs 7FE and 8); Ex. 5a at 49–50 (TT 9); Ex. 6a at 56–57 (TTs 10–11); Ex. 7a at 60–61 (TT 12); Ex. 8a at 49, 53 (TT 13); Ex. 9a at 74 (TTs 14–16); Ex. 10a at 66 (TT 17); Ex. 14a at 128–29 (TTs 22–25 and roving authority); Ex. 16a at 95, 98 (TTs 30–32).

[83] Ex. 1a at 47 (TT 1); Ex. 1c at 49–50 (TT 1FE and TTs 2–4); Ex. 2a at 35 (TT 5); Ex. 3a at 41–42 (TT 6); Ex. 4a at 59–61 (TT 7); Ex. 4b at 71–73 (TTs 7FE and 8); Ex. 5a at 52–54 (TT 9); Ex. 6a at 59–61 (TTs 10–11); Ex. 7a at 64–66 (TT 12); Ex. 8a at 56–57 (TT 13); Ex. 9a at 77–78 (TTs 14–16); Ex. 10a at 70–72 (TT 17); Ex. 11a at

reveal phone numbers and monikers of some conspirators, or writing about a drug transaction; but based on his experience, training, and knowledge, the searches were unlikely to yield substantial evidence.[84]  He also explained that trash searches involved a risk of exposing the investigation that outweighed the likely evidence that agents would have discovered.[85] Additionally, the affidavits described why trash searches would be particularly difficult based on the organization's significant locations and the relative locations of their trash bins.[86]  The affidavits also noted that some of the Target Subjects seemed experienced enough not to carelessly dispose of incriminating documents or drug paraphernalia.[87]  Accordingly, the Government decided that conducting trash searches would have unduly put the investigation at risk.

After reviewing the affidavits, the Court is satisfied with the Government's explanation of its decision not to employ trash searches during the investigation.  Moreover, the Tenth

---

71–73 (TT 18); Ex. 12a at 87–89 (TT 20); Ex. 13a at 77–79 (TT 21); Ex. 14a at 133–35 (TTs 22–25 and roving authority); Ex. 15a at 89–91 (TTs 26–29); Ex. 16a at 105–07 (TTs 30–32).

[84] Ex. 8a at 56–57 (TT 13); Ex. 9a at 77–78 (TTs 14–16); Ex. 10a at 70–72 (TT 17); Ex. 11a at 71–73 (TT 18); Ex. 12a at 87–89 (TT 20); Ex. 13a at 77–79 (TT 21); Ex. 14a at 133–35 (TTs 22–25 and roving authority); Ex. 15a at 89–91 (TTs 26–29); Ex. 16a at 105–07 (TTs 30–32).

[85] Ex. 8a at 56–57 (TT 13); Ex. 9a at 77–78 (TTs 14–16); Ex. 10a at 70–72 (TT 17); Ex. 11a at 71–73(TT 18); Ex. 12a at 87–89 (TT 20); Ex. 13a at 77–79 (TT 21); Ex. 14a at 133–35 (TTs 22–25 and roving authority); Ex. 15a at 89–91 (TTs 26–29); Ex. 16a at 105–07 (TTs 30–32).

[86] Ex. 1a at 47 (TT 1); Ex. 1c at 49–50 (TT 1FE and TTs 2–4); Ex. 2a at 35 (TT 5); Ex. 3a at 41–42 (TT 6); Ex. 4a at 60–61 (TT 7); Ex. 4b at 71–73 (TTs 7FE and 8); Ex. 5a at 53–54 (TT 9); Ex. 6a at 60–61 (TTs 10–11); Ex. 7a at 64–66 (TT 12); Ex. 8a at 56–57 (TT 13); Ex. 9a at 77–78 (TTs 14–16); Ex. 10a at 70–72 (TT 17); Ex. 11a at 71–73 (TT 18); Ex. 12a at 87–89 (TT 20); Ex. 13a at 77–79 (TT 21); Ex. 14a at 133–35 (TTs 22–25 and roving authority); Ex. 15a at 89–91 (TTs 26–29); Ex. 16a at 105–07 (TTs 30–32).

[87] Ex. 4a at 60 (TT 7); Ex. 4b at 73 (TTs 7FE and 8); Ex. 5a at 53–54 (TT 9); Ex. 6a at 61 (TTs 10–11); Ex. 7a at 66 (TT 12); Ex. 8a at 56–57 (TT 13); Ex. 9a at 78 (TTs 14–16); Ex. 10a at 71 (TT 17); Ex. 11a at 72–73 (TT 18); Ex. 12a at 88–89 (TT 20); Ex. 13a at 78–79 (TT 21); Ex. 14a at 134–35 (TTs 22–25 and roving authority); Ex. 15a at 90–91 (TTs 26–29); Ex. 16a at 106–07 (TTs 30–32).

Circuit has never held that trash searches constitute "normal investigative procedures" that the Government must consider before applying for a wiretap.[88]

*Interviews*

The affidavits also explain the use of interviews prior to and throughout the period of wiretapping, stating that agents interviewed individuals related to the organization but chose not to interview close associates of key personnel, nor Target Subjects themselves.[89] The affiants write that such interviews would have exposed their on-going investigation, and may have resulted in the destruction, concealment, or other disposal of crucial evidence.[90] Regarding the interviews that agents did conduct, the affidavits explain that such interviews did not result in the discovery of relevant information about drug customers or suppliers.[91] After reviewing the affidavits, the Court finds the Government's explanation that other interviews were not feasible to be adequate.

---

[88] *See United States v. McDowell*, No. 09-20144-JWL, 2011 WL 830534, at *3 (D. Kan. Mar. 2, 2011) (citing *United States v. Verdin–Garcia*, 516 F.3d 884, 890 (10th Cir. 2008)) ("[T]he Tenth Circuit has not recognized the use of trash pulls as a traditional investigative technique that must be considered before wiretaps become necessary."); *see also United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997) (listing traditional investigative techniques recognized in Tenth Circuit).

[89] Ex. 1a at 45–46 (TT 1); Ex. 1c at 47–49 (TT 1FE and TTs 2–4); Ex. 2a at 33–34 (TT 5); Ex. 3a at 38–39 (TT 6); Ex. 4a at 56–57 (TT 7); Ex. 4b at 69 (TTs 7FE and 8); Ex. 5a at 50–51 (TT 9); Ex. 6a at 57–58 (TTs 10–11); Ex. 7a at 61–62 (TT 12); Ex. 8a at 53–54 (TT 13); Ex. 9a at 74–75 (TTs 14–16); Ex. 10a at 67–68 (TT 17); Ex. 11a at 68–69 (TT 18); Ex. 12a at 83–84 (TT 20); Ex. 13a at 74–75 (TT 21); Ex. 14a at 129–30 (TTs 22–25 and roving authority); Ex. 15a at 85–86 (TTs 26–29); Ex. 16a at 100–03 (TTs 30–32).

[90] Ex. 1a at 46 (TT 1); Ex. 1c at 48–49 (TT 1FE and TTs 2–4); Ex. 2a at 34 (TT 5); Ex. 3a at 39 (TT 6); Ex. 4a at 57 (TT 7); Ex. 4b at 69–70 (TTs 7FE and 8); Ex. 5a at 50–51 (TT 9); Ex. 6a at 57–58 (TTs 10–11); Ex. 7a at 61–63 (TT 12); Ex. 8a at 53–54 (TT 13); Ex. 9a at 74–75 (TTs 14–16); Ex. 10a at 67–68 (TT 17); Ex. 11a at 68–69 (TT 18); Ex. 12a at 83–84 (TT 20); Ex. 13a at 74–75 (TT 21); Ex. 14a at 129–30 (TTs 22–25 and roving authority); Ex. 15a at 85–86 (TTs 26–29); Ex. 16a at 100–03 (TTs 30–32).

[91] Ex. 1a at 45 (TT 1); Ex. 1c at 48 (TT 1FE and TTs 2–4); Ex. 2a at 33 (TT 5); Ex. 3a at 38–39 (TT 6); Ex. 4a at 56–57 (TT 7); Ex. 4b at 69–70 (TTs 7FE and 8); Ex. 5a at 50 (TT 9); Ex. 6a at 57 (TTs 10–11); Ex. 7a at 61–62 (TT 12); Ex. 8a at 53–54 (TT 13); Ex. 9a at 74–75 (TTs 14–16); Ex. 10a at 67–68 (TT 17); Ex. 11a at 68–69 (TT 18); Ex. 12a at 83–84 (TT 20); Ex. 13a at 74–75 (TT 21); Ex. 14a at 129–30 (TTs 22–25 and roving authority); Ex. 15a at 85–86 (TTs 26–29); Ex. 16a at 100–02 (TTs 30–32).

*Grand Jury Subpoenas/Testimony*

Each affidavit also details the non-use of Grand Jury subpoenas. The affidavits explained that the Government did not use a Grand Jury investigation because, according to the affiants' experiences, Target Subjects would invoke their Fifth Amendment privileges if called to testify.[92] The affiants further explained that the Target Subjects—all of whom were suspected of involvement in illegal activity—were unlikely to be truthful unless confronted with facts forcing them to tell the truth.[93] But, as the affidavits describe, such confrontation would require the Government to reveal what it already knew about the organization.[94] Each affidavit explains that the use of a Grand Jury would cause the Target Subjects to become more circumspect in their dealings, or may cause the Target Subjects to drastically change their operations, destroy evidence, or flee.[95] While the Court acknowledges that these explanations are speculative, the Court nevertheless finds the Government adequately explained why a Grand Jury investigation was unlikely to succeed.

---

[92] Ex. 1a at 46 (TT 1); Ex. 1c at 48–49 (TT 1FE and TTs 2–4); Ex. 2a at 34 (TT 5); Ex. 3a at 39–40 (TT 6); Ex. 4a at 57–58 (TT 7); Ex. 4b at 70 (TTs 7FE and 8); Ex. 5a at 51 (TT 9); Ex. 6a at 58 (TTs 10–11); Ex. 7a at 62 (TT 12); Ex. 8a at 54–55 (TT 13); Ex. 9a at 75–77 (TTs 14–16); Ex. 10a at 68–70 (TT 17); Ex. 11a at 69–70 (TT 18); Ex. 12a at 84–86 (TT 20); Ex. 13a at 75–76 (TT 21); Ex. 14a at 130–31 (TTs 22–25 and roving authority); Ex. 15a at 87 (TTs 26–29); Ex. 16a at 103 (TTs 30–32).

[93] Ex. 1a at 46 (TT 1); Ex. 1c at 48–49 (TT 1FE and TTs 2–4); Ex. 2a at 34 (TT 5); Ex. 3a at 39–40 (TT 6); Ex. 4a at 57–58 (TT 7); Ex. 4b at 70 (TT 7FE and 8); Ex. 5a at 51 (TT 9); Ex. 6a at 58 (TTs 10–11); Ex. 7a at 62 (TT 12); Ex. 8a at 54–55 (TT 13); Ex. 9a at 75–76 (TTs 14–16); Ex. 10a at 68–69 (TT 17); Ex. 11a at 69–70 (TT 18); Ex. 12a at 84–85 (TT 20); Ex. 13a at 75–76 (TT 21); Ex. 14a at 130–31 (TTs 22–25 and roving authority); Ex. 15a at 87 (TTs 26–29); Ex. 16a at 103 (TTs 30–32).

[94] Ex. 1a at 46 (TT 1); Ex. 1c at 49 (TT 1FE and TTs 2–4); Ex. 2a at 34 (TT 5); Ex. 3a at 39–40 (TT 6); Ex. 4a at 57–58 (TT 7); Ex. 4b at 70 (TTs 7FE and 8); Ex. 5a at 51 (TT 9); Ex. 6a at 58 (TTs 10–11); Ex. 7a at 62 (TT 12); Ex. 8a at 54–55 (TT 13); Ex. 9a at 75–76 (TTs 14–16); Ex. 10a at 68–69 (TT 17); Ex. 11a at 69–70 (TT 18); Ex. 12a at 84–85 (TT 20); Ex. 13a at 75–76 (TT 21); Ex. 14a at 130–31 (TTs 22–25 and roving authority); Ex. 15a at 87 (TTs 26–29); Ex. 16a at 103 (TTs 30–32).

[95] Ex. 1a at 46 (TT 1); Ex. 1c at 49 (TT 1FE and TTs 2–4); Ex. 2a at 34 (TT 5); Ex. 3a at 39–40 (TT 6); Ex. 4a at 57 (TT 7); Ex. 4b at 70 (TTs 7FE and 8); Ex. 5a at 51 (TT 9); Ex. 6a at 58 (TTs 10–11); Ex. 7a at 62 (TT 12); Ex. 8a at 54–55 (TT 13); Ex. 9a at 76–77 (TTs 14–16); Ex. 10a at 68–69 (TT 17); Ex. 11a at 69–70 (TT 18); Ex. 12a at 85–86 (TT 20); Ex. 13a at 74–76 (TT 21); Ex. 14a at 129–31 (TTs 22–25 and roving authority); Ex. 15a at 87 (TTs 26–29); Ex. 16a at 103 (TTs 30–32).

### 4. Normal Investigative Procedures as a Whole

The Court cannot find that Defendants met their burden of establishing the lack of necessity for wiretaps in this case in light of the successes and limitations of normal investigative procedures as a whole. The necessity requirement in 18 U.S.C. § 2518(1)(c) does not mandate that all other investigative techniques be exhausted before the Government may turn to wiretapping.[96] Even so, the Government here used myriad normal investigative procedures and adequately explained why those normal investigative procedures were inadequate. The Government also provided detailed explanations of the results of each traditional investigative procedure the agents employed and demonstrated that these methods failed to reveal the full scope of the conspiracy, the identities of key personal, and the source(s) of the controlled substances. Additionally, the Government adequately explained why certain investigative procedures were not appropriate in the investigation.

Contrary to Defendants' bald assertions, this is not a case of the Government failing to address the necessity of wiretaps or seeking wiretap authorization after using only one or two normal investigative procedures without explaining why it did not use other procedures.[97] Instead, the Government thoroughly described the results of the normal investigative procedures it used, explaining why it did not use certain procedures, and stating what it knew about the organization during each wiretap period.[98] Accordingly, the Court finds the Government met the

---

[96]*United States v. Zapata*, 546 F.3d 1179, 1186 (10th Cir. 2008) (citing *United States v. Edwards*, 69 F.3d 419, 419 (10th Cir. 1995)).

[97] *See United States v. Mondragon*, 52 F.3d 291, 293–94 (10th Cir. 1995) (reversing district court's finding of necessity because supplemental wiretap affidavit "completely fail[ed] to address the necessity requirement"); *United States v. Castillo-Garcia*, 117 F.3d 1179, 1194 (10th Cir. 1997) (holding that necessity requirement not met because wiretap application relied on conclusory statements and previous investigative techniques were visual surveillance of only two suspects in large conspiracy, and use of background checks, pen registers, and trap-and-trace devices against only few co-conspirators).

[98] *See United States v. Barajas*, 710 F.3d 1102, 1107–08 (10th Cir. 2013) (affirming district court's finding of necessity where affidavits explained why traditional investigative techniques had been ineffective and why other

necessity requirement for all 32 TTs by providing "full and complete statement[s] as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[99]

**E.  Timely Notification Under 18 U.S.C. § 2518(8)(d)**

Defendants' final argument in support of suppression is that the Government did not timely notify them of the wiretaps as required by 18 U.S.C. § 2518(8)(d).  Specifically, Defendants allege that none of the disclosed court orders authorized postponement of notification.  In its Response, the Government argues that the respective court orders *did* authorize a 180-day delay in notification, measure from the "date of filing of the Order to Seal."[100]

The notification requirement is set out in 18 U.S.C. § 2518(8)(d).  That section provides:

> Within a reasonable time but not later than ninety days after . . . the termination of the period of an order [allowing the interception of communications] or extensions thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory which shall include notice of (1) the fact of the entry of the order or the application; (2) the date of the entry and the period of authorized, approved or disapproved interception, or the denial of the application; and (3) the fact that during the period wire, oral, or electronic communications were or were not intercepted.
> [. . .] On an ex parte showing of good cause to a judge of competent jurisdiction the serving of the inventory required by this subsection may be postponed.[101]

---

techniques were would prove ineffective if tried, and supplemental affidavits included new details learned about drug organization).

[99] 18 U.S.C. § 2518(1)(c).

[100] Doc. 265 at 57.

[101] 18 U.S.C. § 2518(8)(d).

Here, Defendants do not challenge the sufficiency of the inventories themselves; rather, they challenge the timing thereof.  As the Government correctly explains, and contrary to Defendants' assertions, the sealing order for each TT permitted a 180-day delay of notification.  On or before the 180th day for TTs 1FE, 2, 3, 3FE, 4, 5, 6, 7, 7FE, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 23, 24, 25, 26, 27, and 28, the Government filed a subsequent application to postpone the notification of interception.  For TTs 27–32, Defendants received their respective inventories in February 2018 as part of discovery.  These disclosures were within the 180-day period of delay provided for in each sealing order.  In sum, all pertinent sealing orders authorized a 180-day delay in serving Defendants' with their inventories; all such inventories were either provided during that 180-day period or applications to postpone notification were filed during that timeframe.

## IV.    Conclusion

Based on the aforementioned reasoning, the Court finds no grounds on which Defendants have demonstrated they are entitled to the suppression of evidence obtained as the result of the wiretap investigation in this case.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Suppress (Doc. 221) is **denied as moot**, and Defendants' Amended Motion to Suppress (Doc. 268) is **denied**.

**IT IS SO ORDERED.**

Dated: October 25, 2019

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE